Filed 4/13/26  Women's Health Specialists v. C.H. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| WOMEN'S HEALTH SPECIALISTS, | C102979 |
| Plaintiff and Respondent, | (Super. Ct. No. 24WV0206304) |
| v. | |
| C.H., | |
| Defendant and Appellant. | |

C.H. regularly participated in anti-abortion protests outside a facility where Women's Health Specialists (WHS) performed abortions.  One day, he purposefully bumped into a WHS employee three times during an incident that occurred in front of WHS's gated parking lot.  Later, the trial court granted WHS's petition (petition) for a workplace violence restraining order (WVRO) against C.H. under the Workplace

Violence Safety Act. (Code Civ. Proc., § 527.8.)[1] On appeal, C.H. contends the restraining order must be reversed because (1) the incident occurred on public property, a place that cannot reasonably be construed as a "workplace" under section 527.8; (2) the trial court erred in finding there was a reasonable probability of future unlawful conduct by C.H.; (3) the WVRO is broader than necessary and not tailored to the facts of the case; and (4) the WVRO violates the First Amendment. The first two contentions are not persuasive and the latter two are forfeited on appeal. Accordingly, we affirm.

BACKGROUND

I

*Factual Background*

One Wednesday morning in September 2024, an anti-abortion protestor who was standing on a patch of dirt between WHS's gated parking lot and the public street that runs parallel to the lot made a "roll down the window" gesture to a car as it pulled out of the lot. When the car stopped just outside the gate, the protestor began talking to its occupants. L.M., who was personally supervising the parking lot and driveway that morning in connection with her role as WHS's escort coordinator,[2] saw the client "stopped in our driveway" with one protestor "kind of blocking her," and a second protestor "leaning in her window on the passenger side." L.M. approached the car to remind the client "that she didn't have to stop and to keep driving." But C.H. placed himself between L.M. and the car. And when L.M. tried to maneuver around C.H. to

---

[1]    Undesignated statutory references are to the Code of Civil Procedure.

[2]    Another responsibility that L.M. had as escort coordinator was ensuring that volunteer escorts understood their roles and clients' expectations: clients "look for the women with the escort's vest that are multi-colored rainbow and have the word, 'escorts.' " "[T]hey will see us when they pull into the parking lot and we will help walk them into the clinic with confidentiality and keep them safe by having an umbrella and we walk them to and from the clinic until they leave our parking lot."

2

reach the car's occupants from different angles to convey her message and "get the client out and not get her involved in a lot of negative energy," C.H. mirrored her movements while facing her and prevented her from reaching the car. In doing so, he "forcibly bumped" her three times with his abdomen, knocking her back and off balance. L.M. walked back through the gate and called the police.

II

*The Petition, C.H.'s Response, and WHS's Trial Brief*

One month later, in October 2024, WHS filed the petition, asking the trial court to order C.H. to stay at least 100 yards away from L.M. and her workplace because of the incident. Multiple sworn declarations supported the petition. The trial court granted a temporary restraining order until it could rule on the merits of the petition after a contested hearing. The temporary order required C.H. to stay at least 100 yards away from L.M., her workplace, and her vehicle.

C.H. filed his response to the petition in November 2024. The four-page document includes a "STATEMENT OF FACTS" section that details WHS's historical efforts to prevent anti-abortion protestors from communicating with individuals entering its clinic, and concludes with a version of the September 2024 incident acknowledging "inadvertent contact" between L.M. and C.H. A separate section, titled "RESPONSE TO RELIEF REQUESTED," sets forth various factual assertions and legal arguments. Among other things, C.H. contends he "did nothing to warrant" a WVRO, that L.M. deliberately instigated the incident to falsely accuse C.H. of battery, and that issuance of a WVRO would deprive C.H. of "his First Amendment right to protest in a traditional public forum—the public sidewalk—outside of . . . WHS's abortion facility." He further argues that any order requiring him to stay away from WHS "for any amount of time . . . would be overbroad and burden significantly more of his speech than necessary."

In December 2024, WHS filed a seven-page "trial brief" that (1) summarized the facts reflected in the declarations that were submitted in support of the petition and

3

(2) presented three distinct legal arguments, including one whose heading asserted, the "First Amendment does not protect [C.H.'s] violent conduct."[3] (Capitalization omitted.) WHS continued: "The First Amendment . . . does not protect violent conduct nor does it protect threats of violence. [C.H.'s] *conduct*, not his speech, is at issue. [He] accordingly has no recourse to the First Amendment," and the trial court "should not entertain [his] attempt to divert the focus of the trial from his unlawful actions against [L.M.] The *only* question before this Court is whether [WHS] has shown sufficient evidence that it meets the statutory requirements to obtain a restraining order against [C.H.]"

The record indicates C.H. did not file a trial brief of his own.

### III

### *The Contested Hearing*

Multiple people testified at a two-day contested hearing that concluded in January 2025, including L.M. and C.H. Two WHS volunteers who saw the incident testified consistently with L.M.'s version of events: C.H. blocked L.M. from reaching the stopped car by following her when she tried to get around him and thrusting his abdomen against her three times. On cross-examination, L.M. insisted the stopped car was in WHS's driveway but said she was unsure if the driveway was WHS's property. C.H. testified that he had been protesting outside WHS every Wednesday for about two and a half years when he stood in L.M.'s way that morning in September 2024 to prevent her from interrupting a conversation between an anti-abortion protestor and a person in the stopped car. He remembered telling L.M., "You can't stop us from talking to people." He maintained she was the one who initiated physical contact: she pushed him with her forearm when she tried get around him. C.H. didn't "normally stand over near the

---

[3]     On our own motion, we augment the record on appeal to include WHS's trial brief, filed December 13, 2024. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

4

gate[d]" parking lot entrance. Usually, he was further down the block on a different street.

After WHS presented all its evidence,[4] counsel for C.H. orally moved for a judgment in his favor on the second day of the hearing, arguing, inter alia, that WHS failed to carry its burden to show (1) that he committed (a) an "act of unlawful violence" against L.M. (b) "in the workplace," and (2) that there was "a credible threat of future violence" by him. Counsel cited four cases in support of those various arguments that span 14 pages of the reporter's transcript. On the question whether the incident took place "in the workplace," C.H. cited *North Coast Village Condominium Assn. v. Phillips* (2023) 94 Cal.App.5th 866 (*North Coast*), and argued: "[H]ere this is not a workplace. This is a public forum and not just a theoretical public forum. It's an actual public forum."

After the trial court denied his motion for judgment, C.H. presented the testimony of two witnesses.

Toward the end of the hearing, the trial court gave both parties an opportunity to raise "any other evidentiary issues or housekeeping issues" before making oral argument. Neither party raised other issues. The trial court then addressed the parties and the courtroom audience simultaneously: "[F]or those of you in the audience I'm mindful that there's some interest in this case and so in these types of cases . . . I try to be a little bit more transparent in explaining how things are going to go. [¶] So we finished the evidentiary portion of this case, so the parties have rested its evidence. The next phase will be the parties will be able to give argument or closing argument which essentially is an encapsulation of the facts and the law as they see it as it supports their particular side of the case. [¶] . . . [¶] And so the way I'm going to do argument, counsel, is just like we

---

[4] C.H. was called as a witness by WHS.

5

would in any other trial. [WHS] will go first as the party with the burden of proof. [C.H.] will then be able to provide an argument, and then I will give [WHS] rebuttal argument. [¶] Following that, I will probably take a brief recess for me to sort of digest everything, consider the arguments that counsel made, the law, go over my notes, won't be very long, and then I can return to open session and I'll issue a ruling."

A.    *Oral Argument*

Counsel for WHS argued the evidence showed the incident was a "straightforward case of workplace violence." He then addressed the question whether the incident took place on WHS's property, arguing L.M. "was carrying out her regular duties and trying to help clinic patients leave safely" "during normal working hours," and *North Coast* supported the notion that the "workplace" may sometimes be "outside the strict confines of the property where [an] employer" is located. After addressing the question of potential future violence by C.H., he concluded: "[B]ased on all the evidence . . . we ask the court to impose a restraining order requiring [C.H.] to stay 100 yards away from [WHS] for the next three years."

Counsel for C.H. started by emphasizing that WHS had to prove its case by clear and convincing evidence. She highlighted what she claimed were weaknesses in WHS's evidentiary showing, including L.M.'s testimony. Then she addressed the question whether the incident occurred in a "workplace," making two points: (1) nothing in the testimony of WHS's witnesses indicated that cars on the street were within the purview of L.M.'s work duties; and (2) even if there were such evidence, the word "workplace" in section 527.8 "cannot be that flexible that it expands to accommodate whatever [WHS] decides to tell [L.M.] to do. [¶] I think the language in the statute about what can reasonably be construed to be the workplace is . . . a reference to, for instance, a shared hallway or a parking lot where you have a multi-tenant building . . . but you've got other private property that is not specifically the workplace. . . . [¶] What it cannot encompass is . . . public property . . . . This is a public forum. It's not [L.M.'s] workplace." She

6

ended her argument by maintaining there was "absolutely no evidence of any credible threat in the future." Counsel did not make any argument about the scope or breadth of any potential restraining order.

B.  *Ruling*

The trial court announced its ruling from the bench after taking a brief recess during which it reviewed its notes from the contested hearing. First, the trial court ruled the incident occurred at a location that "can reasonably be construed" as "in the workplace." It explained: "[T]he incident took place near the gate of [WHS's] place of business. This wasn't a situation where these two individuals ran into each other at a store or some other location that was far removed from the place of business. [¶] And . . .the fact that the actual act of alleged battery may have technically occurred on a public road doesn't necessarily . . . take this out of the purview of the workplace for purposes of [section] 527.8. As I indicated before, the incident took place just outside the gate of the business. [L.M.] was an employee of the business who was on duty at the time of the incident. The conflict . . . was motivated by the nature of the services provided by the business. In other words, this wasn't just a private argument that they had with respect to something that had nothing to do with the business."

Next, the trial court ruled WHS had proved a battery occurred because C.H. "caused his body to come into contact with" L.M.'s body three separate times during the incident, and further ruled that battery constitutes "unlawful violence" within the meaning of section 527.8. The trial court noted "there were . . . diametrically different . . .views of what happened. And for the most part . . . [the trial court] had some issues with [C.H.'s] credibility." It further noted that the evidence, including a video that C.H. recorded soon after the incident (in which he can be heard "talk[ing] about having to get in her face"), indicated that C.H. "was the initial aggressor."

The trial court then turned to the issue of possible future "unlawful violence" and distinguished two cases that C.H. had cited earlier that day when he moved

unsuccessfully for a judgment in his favor.  In contrast to those cases, the trial court explained that it was faced with a "situation where [C.H.] has been at this location . . . protesting, as is his right, for the last couple years."  "[T]he fact that [C.H.] feels very strongly about his opinions with respect to the types of business that [WHS] is involved in is something that creates a concern for the court that there could be future acts of violence."  The trial court also emphasized that C.H. engaged in three distinct acts of battery against L.M., which "upped the ante a little bit."

The trial court concluded:  "So for all of those reasons that I've articulated, I'm finding that . . . [WHS] has met their burden as required by . . . section 527.8.  I will issue an order after hearing for a period of three years. . . .  The terms that I'm going to be imposing will be the exact same terms that are imposed in the temporary restraining order."  Counsel for C.H. did not ask the trial court to consider tailoring the scope of the restraining order on any grounds.

The trial court issued the WVRO in January 2025, and C.H. filed a timely notice of appeal.

DISCUSSION

I

*Legal Background*

A.      *Section 527.8 and Standard of Review*

An "employer . . . of an employee who has suffered . . . unlawful violence . . . from any individual, that can reasonably be construed to be carried out or to have been carried out at the workplace, may seek a [WVRO] after hearing on behalf of the employee and, at the discretion of the court, any number of other employees at the workplace."  (§ 527.8, subd. (a).)  " 'Unlawful violence' is any assault or battery, . . . but shall not include lawful acts of self-defense or defense of others."  (*Id*., subd. (b)(8).)  To obtain a WVRO, the employer " 'must establish by clear and convincing evidence not only that [the individual] engaged in unlawful violence . . . but also that great or

8

irreparable harm would result to an employee if a prohibitory injunction were not issued due to the reasonable probability unlawful violence will occur in the future.' " (*CSV Hospitality Management, LLC v. Lucas* (2022) 84 Cal.App.5th 117, 122-123; see also *Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 489 (*Harris*)[5]; *City of San Jose v. Garbett* (2010) 190 Cal.App.4th 526, 537-538 (*Garbett*).) Determining whether it is reasonably probable that an unlawful act will be repeated in the future " 'rests upon the nature of the unlawful violent act evaluated in the light of the relevant surrounding circumstances of its commission and whether precipitating circumstances continue to exist so as to establish the likelihood of future harm.' " (*Harris*, at pp. 499-500.)

We review a WVRO to determine whether the necessary factual findings are supported by substantial evidence, resolving all factual conflicts and questions of credibility in favor of the prevailing party, and drawing all reasonable inferences in support of the trial court's findings. (*Garbett*, *supra*, 190 Cal.App.4th at p. 538.) Where, as here, the question is whether a fact has been proven by clear and convincing evidence, we review the record as a whole to determine if it contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) " 'But whether the facts, when construed most favorably in [the petitioner's] favor, are legally sufficient to constitute [workplace violence under section 527.8], and whether the restraining order passes constitutional muster, are questions of law subject to de novo review.' " (*Harris*, *supra*, 248 Cal.App.4th at p. 497.)

---

[5]     Though the case concerned a *civil* harassment restraining order under section 527.6, the parties agree that *Harris* correctly articulates the relevant legal framework here.

B.     *Forfeiture*

A party who "fail[s] to pursue and obtain a ruling" on specific issues "may not raise them on appeal. (See *People v. Ramirez* (2006) 39 Cal.4th 398, 450 [defendant forfeited issue by failing, despite court's invitation to resolve it at a later hearing, to press for a ruling]; *People v. Danielson* (1992) 3 Cal.4th 691, 729 [defendant forfeited issue by failing to renew or request a ruling on his earlier objection].)" (*People v. Valdez* (2012) 55 Cal.4th 82, 122, fn. omitted.) This is so because " ' " '[i]n the hurry of the trial many things may be, and are, overlooked which would readily have been rectified had attention been called to them. The law casts upon the party the duty of looking after his legal rights and of calling the judge's attention to any infringement of them. If any other rule were to obtain, the party would in most cases be careful to be silent as to his objections until it would be too late to obviate them, and the result would be that few judgments would stand the test of an appeal.' " ' " (*People v. McKinnon* (2011) 52 Cal.4th 610, 638.)

Constitutional rights " ' "may be forfeited in criminal as well as civil cases by the failure to make timely assertion of the right before a tribunal having jurisdiction to determine it." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 880-881.) And while an appellate court has discretion to consider a forfeited issue on appeal, there is no discretion to consider forfeited issues that raise questions of fact. (*Sacramentans for Fair Planning v. City of Sacramento* (2019) 37 Cal.App.5th 698, 717-718.)

The rule of forfeiture is "always implicated when a party raises in the reviewing court an argument that was insufficiently preserved in the trial court." (*Tindall v. County of Nevada* (2025) 112 Cal.App.5th 78, 86, fn. 5.) Accordingly, application of the rule does not implicate Government Code section 68081. (*Tindall*, at p. 86, fn. 5; *People v. Graham* (2024) 102 Cal.App.5th 787, 798, fn. 6.)

10

## II

### *A Place that "Can Reasonably Be Construed to Be" the "Workplace"*

C.H. argues the trial court erred when it concluded the incident occurred somewhere that reasonably could be construed as L.M.'s workplace, because the incident "indisputably took place on public property, not property to which WHS had any legal claim."[6] WHS argues *North Coast* instructs that section 527.8's overall purpose of facilitating employers' protection of their employees, not "formalistic line-drawing" between an employer's property and the public space just outside it, is key to our analysis. We agree with WHS.

In *North Coast*, a condominium association sought a WVRO against a resident, alleging she was stalking the president of the association's board. (*North Coast*, *supra*, 94 Cal.App.5th at pp. 870, 876.) One question the case posed on appeal was whether stalking by the resident at or near the board president's home could reasonably be construed to have been carried out at the workplace when (1) the board president considered his home to be his office, (2) he frequently responded to association matters at all hours of the day, (3) he was not actively engaged in work at the time of the incidents at issue, and (4) there was uncertainty whether the resident was standing on the board president's patio or on a public sidewalk when she engaged in stalking. (*Id*. at pp. 875, 877, 879, 887-889.) The court reasoned that section 527.8's "overall purpose of allowing employers a means to protect their employees from harm" (*North Coast*, at p. 899), suggests the Legislature was uninterested in the precise location where an employee experienced unlawful conduct that the statute is meant to protect against, so long as the

---

**6**    The legal nature of the location where the incident occurred is unclear. The trial court did not find the incident occurred on public property. Rather, it determined that C.H.'s unlawful violence (battery) "*may have* technically occurred on a public road." (Italics added.)

"violence or threats of violence occur[] in *or near* the physical workplace, as opposed to those stemming from the individual's employment" that lack such a physical nexus (*id.* at pp. 889-900, italics added ["drawing a line between whether [someone] was standing" in a place that is cognizable for purposes of the statute's protection, "but not if she moved one foot back," is "a distinction without a difference, given the statute's overall purpose of allowing employers a means to protect their employees from harm"]; *id.* at p. 900 ["Furthermore, even if" the location "was unequivocally public property, the statute covers 'following or stalking an employee to or from the place of work' (§ 527.8, subd. (b)(1), italics added), which would seem to sufficiently encompass [the employee] being inches off 'workplace' property" (fn. omitted)]).

Focusing on the notion, discussed in *North Coast*, that section 527.8 is *not* intended to protect employees from conduct that lacks a physical nexus to the workplace, even when the conduct "stem[s] from" their employment, C.H. argues L.M.'s testimony about her duties did not include "interacting with patients outside the clinic's property." But this assertion, even if correct, does not address the "in or near" reasoning of *North Coast*. Whether the batteries occurred on the driveway leading to WHS's parking lot or on the public street just off the driveway, at minimum, they occurred "near" the parking lot, which undoubtedly was part of WHS's physical workplace, given L.M.'s testimony that escorts were expected to accompany clients until they left the parking lot.

Further, the operative language of the statute—"can reasonably be construed to be . . . the workplace"—clearly is meant to have a broad scope. If the Legislature had intended a narrower scope, it would have omitted the words "reasonably be construed to be" from section 527.8, subdivision (a), and used more definitive language instead, e.g.: "Any employer . . .of an employee who has suffered . . . unlawful violence . . . from any individual, that *was carried out at the workplace*, may seek . . . an order after hearing on behalf of the employee . . . ." Instead, we have the broader language of the existing statute.

12

Given that broad scope, there were multiple factors here that militated in favor of a conclusion that the location of the incident "can reasonably be construed" to be L.M.'s workplace: (1) it happened on or just off L.M.'s employer's driveway; (2) L.M. was on duty at the time; (3) consistent with her responsibilities that day, L.M. was trying to (a) remind the departing client that "she didn't have to stop" as she was pulling out of WHS's parking lot and (b) protect the departing client from "a lot of negative energy"; and (4) the conflict with C.H. was motivated by the abortion services that WHS provided.

Accordingly, the trial court did not err in ruling the incident occurred somewhere that reasonably could be construed as L.M.'s workplace.

III

*Reasonable Probability of Unlawful Violence in the Future*

C.H. argues the trial court erred in finding a reasonable probability that C.H.'s unlawful violence was likely to reoccur. He argues the trial court "strictly limited the holdings" of two California Court of Appeal cases that he relied on at oral argument "to their facts, ignoring these courts' definitive pronouncements on a petitioner's burden to prove a 'highly probable' threat" of future unlawful violence. He also argues the trial court incorrectly determined that a single act of unlawful violence is sufficient to find future harm is likely if the incident arises out of "disagreement . . . over something" that is "a topic of great public interest." We are not persuaded.

The contention regarding WHS's burden below is unpersuasive because the "highly probable" test is articulated in only *one* of the two cases that C.H. invokes. (Compare *Russell v. Douvan* (2003) 112 Cal.App.4th 399, 404 [articulating a "highly probable" test] with *Scripps Health v. Marin* (1999) 72 Cal.App.4th 332 [articulating a "reasonable probability" test; nowhere articulating a "highly probable" test].) That single case is an outlier that goes against the weight of the case law: a WVRO petitioner's burden in the trial court is to show a "reasonable probability" of future harm. (See, e.g., *CSV Hospitality Management, LLC v. Lucas*, *supra*, 84 Cal.App.5th at pp. 122-123;

13

*Harris*, *supra*, 248 Cal.App.4th at pp. 500-501; *Garbett*, *supra*, 190 Cal.App.4th at p. 542.) But given the "clear and convincing" evidentiary burden that trial courts apply in the WVRO context, there is indeed a "highly probable" element to *appellate* review in WVRO cases. Reviewing courts must inquire if there is substantial evidence from which a reasonable fact finder "could have found it highly probable that the [operative] fact was true." (*Conservatorship of O.B.*, *supra*, 9 Cal.5th at p. 1011.) Here, the operative fact was the existence of "a reasonable probability" that future unlawful violence would occur. Accordingly, the somewhat inelegant question is whether there is substantial evidence from which a reasonable fact finder could have found it highly probable that there was a reasonable probability that future unlawful violence would occur. The answer is yes.

As *Harris* indicates, a likelihood of future interaction between the person who is meant to be protected by a WVRO and the person who is to be restrained by the WVRO is a key consideration in determining a reasonable probability of future harm. (*Harris*, *supra*, 248 Cal.App.4th at p. 501.)[7] And consistent with that approach, the trial court appeared to reason that C.H.'s history of weekly protests outside WHS and his strong opinion about the abortion services that WHS provided indicated a likelihood of future

---

[7] In a footnote, C.H. attempts to distinguish the reasoning of *Harris* on this point, arguing the conduct at issue in that case was a *threat* of violence, not the "unlawful violence" at issue here, and "[b]y definition, threats *threaten* future harm." (See § 527.8, subd. (a) ["Any employer . . . of an employee who has suffered harassment, unlawful violence, or a credible threat of violence from any individual . . . ."].) "Footnotes are not the appropriate vehicle for stating contentions on appeal." (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947.) In any event, we are not persuaded. *Harris*'s reasoning does not emphasize the distinction. (See *Harris*, *supra*, 248 Cal.App.4th at p. 502 ["In order to obtain a restraining order . . . , a trial court needs only to find unlawful harassment exists and that it is probable that an unlawful act will occur in the future . . . . ; [a]s defined, harassment is *either* (1) unlawful violence, (2) a credible threat of violence, or (3) a course of conduct"].)

14

interactions between C.H. and L.M.  The trial court also appeared to reason that C.H.'s commission of not one but *three* separate batteries was significant.  (Cf. *People v. Sanders* (2012) 55 Cal.4th 731, 742 ["Generally, a person who violates the same statute multiple times is more culpable than a person who violates the statute only once."].)  That is sufficient for an affirmative answer to the question at bench.  (Cf. *Harris*, at p. 501 [the trial court's "implied finding" of likelihood of future harm "is supported by sufficient evidence"].)

We do not interpret the trial court's statements from the bench as C.H. asserts— that the trial court ruled that a single act of unlawful violence is sufficient to find future harm if the incident arises out of disagreement over something that is a topic of great public interest.  Rather, we interpret the trial court's observation that C.H. "feels very strongly about" the abortion services that WHS provides as illuminating the trial court's factual finding that it was likely C.H. would return to the scene of the "unlawful violence" he engaged in.  (Cf. *Harris*, *supra*, 248 Cal.App.4th at p. 500 ["Absent indication to the contrary, we must presume that the trial court followed the applicable law and understood that it was required to find that future harm was reasonably probable"].)

IV

*C.H.'s Forfeited Arguments*

C.H.'s third claim is that the WVRO "exceeds basic[] tenets of equitable relief" (capitalization omitted) because it is not "tailored to the facts of the case," and instead is "far broader and more burdensome than necessary to provide complete relief to WHS" and L.M.  His fourth claim is that the WVRO violates the First Amendment.  The claims are forfeited on appeal because C.H. did not sufficiently preserve them in the trial court

15

by obtaining rulings on those issues.[8]  (See *People v. Valdez*, *supra*, 55 Cal.4th at p. 122; *Tindall v. County of Nevada*, *supra*, 112 Cal.App.5th at p. 86, fn. 5.)  Although C.H. mentioned the First Amendment in his response to the petition, it appears he did not mention it again.  He did not respond in writing to WHS's trial brief contention that the First Amendment argument was a "diver[sion]" because C.H.'s "conduct, not his speech, [was] at issue."  Nor do the phrases "First Amendment" or "free speech" appear in his oral argument at the contested hearing.  Similarly, he did not ask the trial court at oral argument to tailor any WVRO to the facts of the case and reduce the stay-away distance from 100 yards.

C.H. raised detailed arguments in the trial court on multiple other questions of fact and law, both in his unsuccessful motion for judgment in his favor and in his closing oral argument.  It was not the trial court's responsibility to recall references to the First Amendment in C.H.'s response to the petition or to proactively ask C.H. if he had concerns about the scope of the WVRO.[9]  (*People v. McKinnon*, *supra*, 52 Cal.4th at p. 638 [because things are often overlooked at trial, it is the responsibility of the litigants to call the judge's attention to matters that are important to them in vindication of their legal rights]; see *People ex rel. Herrera v. Stender* (2012) 212 Cal.App.4th 614, 619, 644-645 [in challenging a preliminary injunction on appeal, a party forfeited a "specific argument" that it failed raise in the trial court].)  Thus, C.H.'s failure to pursue rulings on his third and fourth claims results in forfeiture of those claims on appeal.

---

[8]     WHS argues the trial court "never had the chance to consider whether . . . a narrower injunction" was appropriate, because C.H. "never argued for a narrower stay-away order" in the trial court.

[9]     We disagree with C.H.'s contention that he had no opportunity to make any argument regarding the scope of the WVRO.

To the extent these claims implicate factual considerations, we should not consider them; and to the extent they present any pure questions of law, we decline to consider them. (See *Sacramentans for Fair Planning v. City of Sacramento*, *supra*, 37 Cal.App.5th at pp. 717-718.)[10]

V

*C.H.'s "Objections"*

In a section of his reply brief entitled "OBJECTIONS TO HEARSAY," C.H. contends WHS "improperly attempts to supplement the record" with citations to the sworn declarations that were filed in support of the petition, because WHS did not seek to introduce those documents into evidence in the trial court. C.H. insists he would have objected to the admission of those declarations for the truth of any matter asserted. We reject C.H.'s "objections," which are not in conformance with the California Rules of Court and appellate practice.

In *People v. Zarazua* (2009) 179 Cal.App.4th 1054, 1064, a panel of this court explained that while the appellate rules of court distinguish " 'applications' which do not expressly provide for an opposition time ([Cal. Rules of Court,] rule 8.50), and 'motions,' which do ([*id*.,] rule 8.54)," the appellate rules "do not provide criteria for classifying an undefined request as an application or a motion" (*Zarazua*, at p. 1065). The panel reasoned that undefined requests should be treated as motions if they are not "routine" or if they raise "issues of fact that are potentially subject to dispute." (*Ibid*.) Here, C.H.'s objections to WHS's citations to the trial court record (1) cite no rule of court defining it as an application or motion, (2) are nonroutine, and (3) raise issues of fact that are

---

[10] Because these claims are forfeited, we need not consider the two documents that C.H. requests we take judicial notice of. Accordingly, C.H.'s request for judicial notice is denied. Similarly, forfeiture of these claims makes it unnecessary for us to consider the First Amendment arguments raised by amici curiae American Center for Law and Justice and Animal Activist Legal Defense Project.

17

potentially subject to dispute.  Accordingly, we deny C.H.'s request because he was required to file an independent motion requesting relief.  (See *SCC Acquisitions, Inc. v. Central Pacific Bank* (2012) 207 Cal.App.4th 859, 861, 863 [rejecting a party's "requests to dismiss and to strike portions of" the opposing party's brief because the requesting party "did not file separate motions seeking such relief"].)

In any event, we see nothing remarkable about WHS's citation to sworn declarations that *are in the record*.

DISPOSITION

The judgment is affirmed.  WHS is entitled to recover its costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                          /s/
                        BOULWARE EURIE, J.


We concur:


   /s/
ROBIE, Acting P. J.


   /s/
DUARTE, J.